Joseph H. Malley (TX State Bar No. 12865900)
Law Offices of Joseph H. Malley P.C.
1045 North Zang Blvd
Dallas, Tx 75208
Telephone: (214) 943-6100
Facsmile:   (214) 943-6170
malleylaw@gmail.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ARTHUR LOPEZ, individually, and on behalf of himself, and all others similarly situated individuals, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | JURY DEMAND |
| V. | COMPLAINT FOR: |
| DON HERRING LTD., a Texas Corporation, TACITO & ASSOCIATES, INC., a Texas Corporation, BB DIRECT INC., a Florida Corporation, MONICA BRAVERMAN, an individual, and Doe Individuals and Corporations 1-100 inclusive, | Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. |
| Defendants. | |

**COMPLAINT—CLASS ACTION**

COMES NOW, Plaintiff Arthur Lopez; individually, and on behalf of himself and all others similarly situated individuals, by and through his Attorney, Joseph H. Malley, with the Law Offices of Joseph H. Malley, P.C., move for as and for his complaint, and demanding trial by jury, allege as follows upon information and belief, based upon, *inter alia*, investigation conducted by and through his attorney, which are alleged upon knowledge, bring his legal action against Don Herring Ltd., (hereinafter referred individually to as "Herring"), TaCito & Associates Inc., (hereinafter referred individually to as "Tacito"), BB Direct Inc., (hereinafter referred individually to as "BB Direct"),  Monica Braverman, (hereinafter referred individually to as "Braverman"), and Doe Individuals and Corporations 1-100 inclusive., (hereinafter referred collectively to as "Defendants"). Plaintiff allegations as to himself and his own actions, as set forth herein, are based upon his personal knowledge, and all other allegations are based upon information and belief pursuant to the investigations of counsel. Based upon such investigations, Plaintiff believe that substantial evidentiary support exists for the allegations herein, or that such allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

The true names and capacities, whether individual, corporate, associate, director, officer, agent, its employees, officers, directors, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control, or

group of individuals associated in fact, although not a legal entity, or other legal entity, of each of the Defendant Doe Individuals and Corporations 1-100 inclusive, (hereinafter referred collectively to as "Doe"), are unknown to Plaintiff at his time and therefore Plaintiff sues Doe by such fictitious names. Plaintiff will ask leave of the Court to amend his complaint to show the true names and capacities of Doe when that information is ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as Doe are legally responsible in some manner for the performance of the acts and omissions described below, and are liable for the events and happenings alleged, and in such manner, proximately caused harm to Plaintiff as further alleged.

Defendants Herring, TaCito, BB Direct, Braverman, Doe Individuals and Corporations 1-100 inclusive, and National Affiliates, and each of them, are individually sued as participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and transactions, including but not limited to acts, whether individual, corporate, associate, director, officer, agent, its employees, officers, directors, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, of each of the Defendants, that are the subject of his complaint.

**I.**

**NATURE OF ACTION**

1.  Plaintiff brings this consumer Class Action lawsuit pursuant to Federal Rules of Civil

Procedure 23(a), (b)(1), (b)(2), and (b)(3), on behalf of himself and a proposed class of

similarly situated Individuals, (hereinafter referred to as "Class Members"), who were

victims of unfair, deceptive, and unlawful business practices; wherein privacy and

security rights were violated by Defendants, and each knowingly authorized, directed,

ratified, approved, acquiesced, or participated, in conduct made the basis of this class

action, acting in a capacity best described colloquially to as "Suppliers," and

"Distributors", acting independently, and in concert, with Doe Individuals and

Corporations 1-100 inclusive, (hereinafter referred individually to as "Doe" and

collectively referred to as "National Affiliates"), and each knowingly authorized,

directed, ratified, approved, acquiesced, or participated, in conduct made the basis of

his class action, in acts that include one (1) or more of the following:

> 1. Obtain, Plaintiff and Class Members' Motor Vehicle Records,
> (hereinafter referred to as MVRs"), from State Motor Vehicle
> Departments, without written express consent, for purposes that
> violated the Driver's Privacy Protection Act (hereinafter referred to as
> "DPPA");
>
> 2. Re-disclose, directly or indirectly, Plaintiff and Class Members' MVRs,
> without written express consent, for purposes that violated the DPPA;
>
> 3. Re-sell, directly or indirectly, Plaintiff and Class Members' MVRs,
> without written express consent, for purposes that violated the DPPA.

2. The nature of his action includes a sequence of events, each which violates the DPPA individually and collectively, wherein:

a. Defendant Braverman obtained Plaintiff and Class Members' motor vehicle records, derived directly or indirectly, from State Motor Vehicle Departments, for direct marketing, without authorization and written express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act, perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiff and Class Members;

b. Defendant Braverman intentionally, or in the alternative, negligently re-disclosed and/or resold Plaintiff and Class Members' motor vehicle records, derived directly or indirectly, from State Motor Vehicle Departments to Defendant Herring, TaCito, BB Direct, and National Affiliates, for direct marketing, without authorization and written express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiff and Class Members, and on occasions, acting, or omitting to act, in a negligent manner, (*Gordon v. Softech Int'l, Inc.,* U.S., No. 13-533, *cert. den.* 1/13/14; *Arcanum Investigations, Inc. v. Gordon,* U.S., No. 13-539, *cert. den.* 1/13/14);

c. Defendant Herring, TaCito, BB Direct, and National Affiliates obtained Plaintiff and Class Members' motor vehicle records, derived directly or indirectly, from State Motor Vehicle Departments, for direct marketing, without authorization and written express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act, perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiff and Class Members;

d. Defendant Herring, TaCito, BB Direct, and National Affiliates intentionally, or in the alternative, negligently re-disclosed and/or resold Plaintiff and Class Members' motor vehicle records, derived directly or indirectly, from State Motor Vehicle Departments to National Affiliates, for direct marketing, without authorization and written express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiff and Class Members, and on occasions, acting, or omitting to act, in a negligent manner, (*Gordon v. Softech Int'l, Inc.,* U.S., No. 13-533, *cert. den.* 1/13/14; *Arcanum Investigations, Inc. v. Gordon,* U.S., No. 13-539, *cert. den.* 1/13/14);

e. Defendants acted independently, and in concert, and each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of his class action. Defendants obtained Plaintiff, and Class Members', MVRs to use, process, store, re-disclose, resell, and purchase Personal Identifying Information, derived in whole or part, from Plaintiff and Class Members' MVRs, maintained by the State Motor Vehicle Department in acts which include, but are not limited to, conducting, aiding and abetting, assisting, facilitating, participating in a pattern of conduct, an enterprise affecting interstate commerce, including as a direct market provider of MVRs, to market and solicit, directly or indirectly, Plaintiff and Class Members, without his express consent.

d. Plaintiff suffered an injury in fact, an invasion of a legally protected interest which was concrete and particularized, a harm that was actual or imminent.

3. On information and belief, each Defendant used additional parties to commit such acts, made the basis of his action, individually and jointly, both intentionally and negligently, in whole or part, acting as a direct, or contributory party, to the action made the basis of his action. Pending discovery of such affiliates' involvement, acts complained of, and made the basis of his complaint, Plaintiff will amend the complaint to include such parties.

## II.
## PARTIES

4. Plaintiff ARTHUR LOPEZ is an individual residing in Dallas County, Texas, and is a licensed and registered driver in the State of Texas. His motor vehicle records, includes name, address, VIN number, vehicle type, make, model, year, and license plate number. Plaintiff Lopez's motor vehicle records were obtained by Defendants for purposes that included direct marketing use, which resulted in a direct marketing letter being sent to Plaintiff Lopez, without his express consent.

5. Defendant DON HERRING LTD., a Texas Corporation with its headquarters in Texas, does business within Texas, uses the following assumed names: DON HERRING NORTH MITSUBISHI, and HERRING MANAGEMENT, L.L.C., was doing business within this State during the Class Period, and may be served with process by serving its registered agent: Don Herring, 4225 W. Plano Parkway, Plano, TX 75093, USA.

6. Defendant TACITO & ASSOCIATES, INC., a Texas Corporation with its headquarters in Texas, does business within Texas, uses the following assumed names: TaCito Direct, a fictitious name not registered with the Texas Secretary of State, existing as an alter-ego: TaCito Direct Marketing, was doing business within his State during the Class Period, and who may be served with process by serving its registered agent: Anthony J. Tacito, 14165 Proton, Dallas TX, 75244, USA.

7. Defendant BB. DIRECT INC., is a Florida Corporation, does business in Texas, was doing business within his State during the Class Period, and who may be served with process by serving its registered agent: Brian Berg, 1732 SW 44th St. Cape Coral, Florida 33914, USA.

8. Defendant MONICA BRAVERMAN is an individual that resides in Texas, does business in Texas, uses the following assumed names for owned corporations, existing as alter-egos: NETUNIM, LP, DATASHARK, LLC., SEQUITUR SYSTEMS INC., and SOCHARET, LLC., was doing business within his State during the Class Period, and who may be served with process by serving Monica J. Braverman, 11303 E. Rocky Creek Road, Crowley Texas, 76036, USA.

**III.**
**JURISDICTION AND VENUE**

9. This Court has jurisdiction over the subject matter jurisdiction of his action pursuant to 28 U.S.C. § 1331.

10. This Court has jurisdiction over Defendant DON HERRING LTD., a Texas Corporation that operated within the class period in the State of Texas at the following Texas address: 4225 W. Plano Parkway, Plano, TX 75093, USA.

11. This Court has jurisdiction over Defendant TACITO & ASSOCIATES, INC., a Texas Corporation that operated within the class period in the State of Texas at the following Texas address: 14165 Proton, Dallas TX, 75244, USA.

12. This Court has jurisdiction over Defendant BB DIRECT Inc., a florida Corporation that operated within the class period in the State of Texas.

13. This Court has jurisdiction over Defendant MONICA BRAVERMAN, an individual that operated within the class period in the State of Texas at the following Texas address: 11303 E. Rocky Creek Road, Crowley Texas, 76036, USA.

14. Plaintiff is a citizen and resident of Dallas County, Texas, and asserts and claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories. There is minimal diversity of citizenship between proposed Class Members and Defendants.

15. This court has Federal question jurisdiction as the complaint alleges violations of the following:

        a)   Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721, et. seq.

16. Subject-matter jurisdiction exists in this Court related to his action pursuant to 28 U.S.C. § 1332.  The aggregate claims of Plaintiff and the proposed Class Members exceed the sum or value of $5,000,000.00.

17. Venue is proper in his District, and vests jurisdiction in the State of Texas and Federal Courts in his district, under 28 U.S.C. §1391(b) and (c) against Defendants. A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred within his state, and within this district. Thus, mandatory jurisdiction in his U.S. District Court vests for any Class Member, wherever they reside, which occurred within the United States. The application of the law should be applied to any Class Member, made the basis of his action, anywhere within the United States, as if any and all activity occurred entirely in Texas and to a Texas resident. Thus, citizens and residents of all states are Class Members, for all purposes related to this instant Complaint, similarly situated with respect to his rights and claims as Texas residents, and therefore are appropriately included as Class Members, regardless of his residency, or wherever the activity occurred made the basis of his action.

18. Minimal diversity of citizenship exists in his action, providing jurisdiction as proper in the Court, since Defendants conducted activity within his state and in this district during the class period, and Plaintiff include citizens and residents of this state and district, and assert claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories; thus there is minimal diversity of citizenship between proposed Class Members and the Defendants.

19. This is the judicial district wherein the basis of the conduct complained of herein involving the Defendants was implemented, in whole or part.  Motor vehicle records were

obtained from his state and used within the state and district; therefore, evidence of

conduct as alleged in his complaint is located in his judicial district.

**IV.**

**DRIVER'S PRIVACY PROTECTION ACT 18 U.S.C. §2721 et seq.**

20. With the advancement of information technology in the 1980's a threat to privacy

arose from the nonconsensual dissemination of personal information, and Congress

sought to regulate particular private sectors. The highly publicized 1989 murder of actress

Rebecca Schaeffer brought to light the potential threat to privacy and safety posed by his

commerce in motor vehicle record information. Schaeffer had taken pains to ensure that

her address and phone number were not publicly listed. Despite those precautions, a

stalker was able to obtain her home address through her state motor vehicle records.

Evidence gathered by Congress revealed that the incident involving Rebecca Schaeffer

was similar to many other crimes in which stalkers, robbers, and assailants had used state

motor vehicle records to locate, threaten, and harm victims. Based on evidence about

threats to individuals' privacy and safety from misuse of personal information in state

motor vehicle records, Congress enacted the DPPA to restrict the disclosure of personal

information in such records without the consent of the individual to whom the

information pertains.

21. To protect the privacy and safety of licensed drivers, and to limit misuse of the

information contained in these government record systems, Congress enacted the

Driver's Privacy Protection Act of 1994, 18 U.S.C. §§2721-2725. The Act imposed strict

rules for collecting the personal information in driver records, and provided for liability in

cases where an individual or corporation improperly collects, discloses, uses, or sells such

records. Congress paid particular attention to differences between motor vehicle records and other public records containing similar information, which it decided not to regulate. One concern that motivated enactment of the DPPA was that personal information in motor vehicle records, including names and addresses, is associated with license plate numbers, which drivers must display to the general public:

"Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold his names and address[es] from strangers, and his limit his access to personal identifiable information" in other records".

140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran).

22. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records. Representative Moran noted in part:

"Balancing the interests of public disclosure with an individual's right to privacy is delicate, but essential, task for government. The Driver Privacy Protection Act (H.R. 3365), which I introduced last week, safeguards the privacy of drivers and vehicle owners by prohibiting the release of personal information—including a person's name and address—to anyone without a specific business-related reason for obtaining the information. His bill by itself will not stop stalking. But it will stop State government from being an accomplice to the crime".

LEGISLATION TO PROTECT PRIVACY AND SAFETY OF LICENSED DRIVERS—H.R. 3365 (Extension of Remarks- November 03, 1993) [Page: E2747]," HON. JAMES P. MORAN in the House of Representatives, WEDNESDAY, NOVEMBER 3, 1993, (last accessed September 27, 2013).

23. The testimony before Congress also discussed concerns that the personal information contained in state DMV records had considerable commercial value. In particular, the personal information sold by state DMVS were being used extensively at that time to support the direct-marketing efforts of businesses. See 1994 WL 212836 (Feb. 3, 1994)

(statement of Richard A. Barton, Direct Marketing Association) ("The names and addresses of vehicle owners, in combination with information about the vehicles they own, are absolutely essential to the marketing efforts of the nation's automotive industry."). Personal information in DMV records "is combined with information from other sources and used to create lists for selective marketing use by businesses, charities, and political candidates." 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994) (statement of Rep. Moran) ("Marketers use DMV lists to do targeted mailings and other types of marketing.").

24. Due to the concerns regarding the improper uses of motor vehicle records by the marketing industry, the DPPA, initially enacted in 1994, was amended in 1999 to change the law to eliminate the practice of selling personal information. Senator Shelby, the principal sponsor, warned against "unrelated secondary uses" of motor vehicle information without prior approval (i.e., for commercial sale in the open market), when the records have been obtained only for the purpose of vehicle registration. Senator Shelby underlined that the purpose of the DPPA was to ensure that individuals must "grant his consent" before the state or a third party can sell or release highly restricted personal information "when it is to be used for the purpose of direct marketing, solicitations, or *individual look-up*." *4 Hrg. Before the Subcomm. on Transp. of the S. Comm on Appropriations, 106th Cong.* (2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

25. The "opt-out" provisions of the original version of the DPPA was changed to "opt-in" provisions in §§2721(b)(11) and (12) by the October 1999 amendments to the DPPA. See Pub. L. No. 106-69, 113 Stat. 986 (Oct. 9, 1999). Personal information in motor vehicle

records could now be disclosed in certain circumstances for bulk distribution for surveys, marketing, or solicitation, but only if individuals are provided an opportunity, in a clear and conspicuous manner, to block such use of information pertaining to them. 18 U.S.C. §2721(b)(12).

26. The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name address (but not the five (5) digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. §2725(3). "[M]otor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. §2725(1). The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information.

27. The 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran). The DPPA never explicitly lists any prohibited uses; rather, it generally prohibits all but the fourteen permissible uses enumerated in section 2721(b). The fourteen permissible uses under the DPPA are:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original Owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only-

> (A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

> (B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, re-disclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claimed investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under his subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety. 18 U.S.C. §2721(b).

28. Sections 2721(a) and 2722(a) make nondisclosure of personal information the default rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of his title."). Section 2721(b) then lists fourteen discrete exceptions to non-disclosure.

29. According to section 2721(c), "[a]n authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or re-disclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An Authorized Recipient under (b)(11) may resell or re-disclose personal information for any purpose. An Authorized Recipient under section (b)(12) may resell or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c).

30. Any person who receives personal information from a DMV and resells or further discloses that information must, for five (5) years, maintain records identifying each person or entity to whom a further resale or re-disclosure was made, and the permitted purpose for such resale or re-disclosure. See 18 U.S.C. 2721(c) (fourth sentence) (1994 &

Supp. III 1997).

31. The DPPA creates a private right of action for "the individual" whose personal

information was knowingly obtained, disclosed, or used "for a purpose not permitted"

under section 2721(b). 18 U.S.C. § 2724(a). "It shall be unlawful for any person knowingly

to obtain or disclose personal information . . . for *any* use not permitted under section

2721(b) of his title." 18 U.S.C. § 2722(a).

32. The DPPA expressly provides for liquidated damages independent of showing actual

damages, where all damages are subject to the Court's discretion. The remedy for a

violation of the DPPA is unambiguous under the plain terms of the statute. In *Kehoe v.*

*Federal Bank & Trust*, the Eleventh Circuit held, based on the unambiguous language of

the DPPA, which actual damages are not necessary in order to recover under the

liquidated damages provision of the DPPA. 421 F.3d 1209, 1212 (11th Cir. 2005) (citing

*Doe v. Chao,* 540 U.S. 614 (2004)). The DPPA remedies are as follows:

> (b) Remedies.--The court *may* award--
> (1) Actual damages, but not less than liquidated damages in the amount of $2,500;
> (2) Punitive damages upon proof of willful or reckless disregard of the law;
> (3) Reasonable attorneys' fees and other litigation costs reasonably incurred; and
> (4) Such other preliminary and equitable relief as the court determines to be
>     appropriate.

33. The Congressional record is clear: the core of the DPPA is to prevent the unauthorized

obtainment of a citizen's personal information and the statute creates a tangible right to

have one's information secure. The violation of that security is a harm that supports

standing.

**PLAINTIFF OCCURRENCES, HARM, AND STANDING**

## A. PLAINTIFF OCCURRENCES

34. Plaintiff ("Plaintiff") is a United States resident. Class Members are United States residents that experienced the same occurrences as Plaintiff:

   a.  Plaintiff registered a motor vehicle with the State Motor Vehicle Department within his state during the Class Period. Plaintiff was legally obligated to provide Personal Identifying Information ("Pii") within the motor vehicle information provided to the State Motor Vehicle Department for purposes required by law in order to be legally able to operate his vehicle within his state, an obligation that did not require the release of such to any individual or corporation that did not possess legal rights to access his motor vehicle records;

   b.  Plaintiff motor vehicle records were obtained by Defendants, directly or indirectly, for impermissible DPPA purposes, without notice or express consent of the Plaintiff;

   c.  Plaintiff was unaware that Defendants would obtain, directly or indirectly, re-disclose and/or resell, his motor vehicle records for impermissible DPPA purposes. Plaintiff could not have learned about Defendants access to his motor vehicle records except through unreasonably burdensome efforts, such as those required in the investigation underlying these allegations;

   d.  Plaintiff had Defendants re-disclose and/or re-sell his motor vehicle records, intentionally, or in the alternative, negligently, to National Affiliates for

impermissible DPPA purposes;

    e.   Plaintiff had National Affiliates obtain his motor vehicle records from Defendants knowing the source of the Plaintiff motor vehicle records was the State Motor Vehicle Department, for impermissible DPPA purposes;

    f.   Plaintiff received a direct marketing letter from Defendant Don Herring, using data derived, in whole or part, from Plaintiff's motor vehicle records obtained by Defendants Braverman, TaCito, and BB Direct Inc.. Plaintiff became the victim of privacy and security violations due to Defendants' unauthorized access to, and use of, his motor vehicle records, suffering harm, and seek monetary and injunctive redress.

    g.   Plaintiff requires permanent injunctive relief because Defendant's violation of the DPPA is ongoing and, without the Court's intervention, will continue even if the Court were to award a money judgment for past instances of DPPA violations to Plaintiff, but will do nothing to protect Plaintiff rights going forward.

**B.**  **PLAINTIFF HARM**

35. Plaintiff has suffered an Injury In Fact-that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical." as a result of the Defendant's unauthorized obtainment, re-disclosure, and/or resale of Plaintiff motor vehicle records, obtained without express consent, from state motor vehicle departments for uses that included direct marketing, a violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq., Defendants, individually and collectively, caused  Plaintiff "Tangible" and "Intangible" harms, including but

not limited to, the following:

**1. Violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq.**

36. Plaintiff suffered an injury in fact because Defendants violated a "legally protected privacy interest", protected by the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq., resulting in an Injury-In-Fact-that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical, resulting in tangible and intangible harms mentioned herein.  Plaintiff injury in fact was due to the taking, and public disclosure of Personal Identifying Information contained within Plaintiff motor vehicle records. The private affairs of the Plaintiff include the contents of his motor vehicle records. His information is especially private because it reveals an individual's name, address, and his motor vehicle information, which should not be publicly disclosed such information that reasonable people ordinarily understand to be private, as well as in intrusion into his private matters. Plaintiff motor vehicle records are not a matter of legitimate public concern. Therefore, Defendants surreptitiously obtaining Plaintiff private motor vehicle records held by State Department of Motor Vehicle Departments for purposes that include direct marketing is, and will continue to be, regarded as highly offensive and objectionable and a violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq., due to one (1) or more of the following acts:

   a. Obtainment of Plaintiff and Class Members' Motor Vehicle Records from State Motor Vehicle Departments, without his express consent, for purposes that violated the Driver's Privacy Protection Act (hereinafter referred to as "DPPA");

   b. Re-disclosure, directly or indirectly, Plaintiff and Class Members' MVRs, without his express consent, for purposes that violated the DPPA; and

c.  Re-sale, directly or indirectly, Plaintiff and Class Members' MVRs, without his express consent, for purposes that violated the DPPA.

## 2. Informational Injury

37. Plaintiff suffered an injury in fact because Defendants failed to provide information as required including, but not limited to, the following:

a. Defendants had a legal obligation to inform the State Department of Motor Vehicles and Plaintiff that the motor vehicle records it had obtained, directly or indirectly, would be used, directly or indirectly, for direct marketing. The failure to provide his information injured Plaintiff;

b. Defendants had a legal obligation to inform the State Department of Motor Vehicles and Plaintiff that the motor vehicle records it had obtained, directly or indirectly, would be re-disclosed and/or re-sold, directly or indirectly, to Defendant National Affiliates, entities known to be in the direct marketing business. The failure to provide his information injured Plaintiff;

c. Defendants had a legal obligation to inform the State Department of Motor Vehicles and Plaintiff that the motor vehicle records it had obtained, directly or indirectly, and re-disclosed and/or resold was being used for acts which violated the DPPA:

"The Purchaser shall immediately inform the State if privacy protected personal information provided to the purchaser is disclosed in violation of the   DPPAs. His obligation applies whether the disclosure was by the Purchaser or a person or entity that acquired privacy protected information from the Purchaser, directly or indirectly".

The failure to provide his information injured Plaintiff;

d.  Defendants had a legal obligation requiring notice to the Plaintiff, and all

affected individuals, pertaining to the unauthorized use of the motor

vehicle records it provided to Defendant National Affiliates which were

used for direct marketing, without the Plaintiff express consent. Such

notice should have been done in the most expedient time possible and

without unreasonable delay. Defendants compounded his information

injury, an injury that continues to date, failing to notify Defendant

National Affiliates to cease use of the motor vehicle records; moreover,

failing to notify Plaintiff that [his] motor vehicle records were being used

improperly, the failure of such notice resulted in harm. The failure to

provide his information injured Plaintiff.

### 3. Lost Time, Money, and Resources

38. Plaintiff suffered an injury in fact because Defendants made the Plaintiff lose time,

money, and resources including, but not limited to, the following:

a. Plaintiff expended [his] time, money, and resources to provide the motor
vehicle record information to State Motor Vehicle Departments, an obligation
required by law. Plaintiff expended [his] time, money, and resources with the
understanding that such information would only be used for permissible
purposes. Defendants obtained [his] motor vehicle record information [he]
provide[d] to the State Motor Vehicle Departments for impermissible uses,
negating Plaintiff expenditure of [his] time, money, and resources;

b. Plaintiff lost [his] time, money, and resources involving the receipt of the
unauthorized and unwarranted offers, Defendant National Affiliates' Direct
Marketing letters, an intrusion upon and occupation of the Plaintiff property. These
unwarranted offers wasted [his] time, money, and resources, IE, by depleting limited
time for Plaintiff to obtain, open, read, comprehend the letters, and handling such
accordingly, an interruption and distraction.

### 4. Identity Theft, and Risk of Future Identity Theft, Fraud, and Swindles

39. Plaintiff suffered an injury in fact because Defendants unauthorized obtainment, re-

disclosure, and re-sale of [his] motor vehicle record resulted in Identity Theft; moreover, such also created a risk of future identity theft, fraud, and swindles which amounts to a material risk of harm, concrete and particularized, imminent, and certainly impending. Courts have held that "the risk that Plaintiff personal data will be misused by … hackers … is immediate and very real." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214 (N.D. Cal. 2014). In *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015), the risk of identity theft was sufficient to confer Article III standing because Plaintiff alleged that data servers had already been breached. Id. at 694. That "threatened harm" therefore "is sufficiently concrete and imminent" to satisfy Article III standing.

**5. Security Risk**

40. Plaintiff suffered an injury in fact because Defendants' unlawful disclosures created a material risk, a security risk of bodily injury and harm, if the personal information inherent within the motor vehicle records, including but not limited to, the Plaintiff name and address was re-disclosed, intentionally or negligently, to persons that would do harm to the Plaintiff and his family. The *Spokeo* Court specifically stated that "the risk of real harm" can "satisfy the requirement of concreteness." *Spokeo*, 136 S. Ct. at 1549. His security risk, an attributing factor for enactment of the DPPA in 1994, and amendment in 2000, poses a material risk of harm, actual, imminent, and certainly impending for Plaintiff and his family.

**C. PLAINTIFF STANDING**

41. To establish Article III, § 2. Standing, a doctrine rooted in the U.S. Constitution's "case

or controversy" requirement, Plaintiff must demonstrate (1) an injury-in-fact that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical.", (2) fairly traceable to the defendants' actions, (3) that is likely to be redressed by a favorable decision. Plaintiff have satisfied all three (3) requirements, resulting in the aforementioned tangible and intangible harms.

42. The U.S. Supreme Court's recent opinion reaffirmed in Spokeo that 'Intangible" Injuries are "Concrete" for Purposes of Article III 2. Standing where Congress Codified Established Common Law Rights, as Here, Codifying the Driver's Privacy Protection Act, 18 U.S.C. §2721, et. seq. *Spokeo,* reaffirmed the fundamental—and uncontroversial—principle that to establish injury-in-fact under Article III a Plaintiff must allege "an injury that is both 'concrete *and* particularized.'" *Spokeo,* 136 S. Ct. at 1545 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc*., 528 U.S. 167, 180-181 (2000)) (emphasis in original). After clarifying that the "concrete" and "particularized" inquiries must be conducted separately, the Court affirmed the long-standing principle that a concrete injury can be either tangible, such as monetary loss, or *intangible*, such as a violation of one's free speech or free exercise rights. *Id*. at 1549 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)).

**I. Injury In Fact-that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical."**

**a.  Plaintiff Injuries are "Concrete", not merely a "Bare Procedural Violation"**

43. To establish the initial standard of the first element –injury in fact- Plaintiff has

satisfied the "Concreteness" requirement because The Supreme Court's

reaffirmed in *Spokeo* that violations of a statute protecting against "intangible"

harm *can* constitute "concrete" injuries sufficient to confer Article III standing,

without the need to show any further harm. 136 S. Ct. 1540, 1549 (2016). Where,

as here, the interests protected by a statute have a "close relationship" to rights

rooted in the common law, or where Congress has "elevate[d]" certain rights "to

the status of legally cognizable injuries," violations of those interests amount to

injury-in-fact. *Id*. In other words, a Plaintiff in such a case ***need not*** allege any

*additional* harm beyond the one Congress has identified." *Id.* (emphasis added).

44. The Supreme Court, in evaluating whether an intangible injury is sufficiently "concrete"

to satisfy the injury-in-fact requirement, identified two important factors: the history

and the judgment of Congress, providing the following instructions to Courts: "it is

instructive to consider whether an alleged intangible harm has a close relationship to a

harm that has traditionally been regarded as providing a basis for a lawsuit in English or

American courts." *Spokeo*, 136 S. Ct. at 1549. 'Private rights' have traditionally included

rights of *personal security*, property rights, and contract rights." *Id.* (emphasis added)

(citing 1 W. Blackstone, Commentaries at *130-139). Injury to personal privacy has long

provided a basis for suit in American courts. See Restatement (Second) of Torts §652A

cmt. a (1977) (noting that "the existence of a right of privacy is now recognized in the

great majority of American jurisdictions"); *Pavesich v. New England Life Ins. Co*., 50 S.E.

68, 70 (Ga. 1905) ("A right of privacy . . . is therefore derived from natural law. His idea

is embraced in the Roman's conception of justice . . . .); Samuel D. Warren & Louis D.

Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890) (noting that "the

common-law right to intellectual and artistic property are . . . but instances and

applications of a general right to privacy.")

**1. Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. Codifies "Concrete" Privacy Injuries that are Historically Recognized in Common Law**

45. The history of common law rights to privacy and the judgment of Congress, explicitly

contemplated in the legislative histories of the respective statutes, resulted in the

enactment of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. to protect an

individual's right to personal privacy and security, which traditionally provided a basis

for a lawsuit at common law. Far from being a "Bare Procedural Violation", Defendant's

conduct is the core harm contemplated that the DPPA guards against.

46.  The DPPA expressly protects and codifies fundamental privacy rights that are rooted in

history and the common law. Sections 2721(a) and 2722(a) make nondisclosure of

personal information the default rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting

disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. §

2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal

information . . . for any use not permitted under section 2721(b) of his title."). Section

2721(b) then lists fourteen discrete exceptions to non-disclosure; furthermore,

according to section 2721(c), [a]n "authorized" recipient of personal information (except

a recipient under subsection (b)(11) or (12)) may resell or re-disclose the information

only for a use permitted under subsection (b) (but not for uses under subsection (b)(11)

or (12)). An Authorized Recipient under (b)(11) may resell or re-disclose personal

information for any purpose. An Authorized Recipient under section (b)(12) may resell

or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c).

As such, the DPPA is a codification of well-established common law rights of privacy.

47. In enacting the DPPA, Congress recognized that it was codifying claims rooted in the common law: "[T]he right of privacy, the right to be left alone, and the right against unreasonable searches and seizures—the right, that is, to be personally secure—are among the most highly valued rights of an American citizen. These guarantees have been a part of Anglo-Saxon law ever since the 15th century." 114 Cong. Rec. S6194 (daily ed. May 23, 1968) (statement of Sen. Fong). Thus, there can be no doubt that the unauthorized access to Plaintiff motor vehicle records for purposes that included direct marketing without prior consent— codified as unlawful by DPPA—amounts to a "concrete" injury that bears, at a minimum, a "close relationship" to the common law's steadfast protection of one's fundamental right of privacy.

48.  The DPPA creates for Plaintiff[s] a specific, enforceable legal right, derived from common law, to expect Defendants to not gain access to [his] identifying information …contained within motor vehicle records held by State Department of Motor Vehicles [and] its violation constitutes a concrete, particularized deprivation.  Defendants violated the statute by obtaining, re-disclosing and/or re-selling Plaintiff[s'] personal information, and it deprived Plaintiff[s] of a right to which [they] [were] particularly entitled by law, constituting an injury-in-fact, acts sufficient to confer Article III, § 2. Standing.

**2. The U.S. Congress Recognized a "Concrete" Harm Related to the Unauthorized Obtainment, Re-disclosure, and Re-sale of Motor Vehicle Records Obtained from State Motor Vehicle Departments By Enacting The Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq.**

49. The "judgment of Congress"—which is both "instructive and important"—also confirms

that the claims here satisfy Article III. *Spoeko*, 136 S. Ct. at 1549. The legislative history

of DPPA makes clear it was intended to recognize and codify the concrete harm that

results from having a third party obtain, re-disclose, and/or re-sell his motor vehicle

records, without express consent, for purposes that included direct marketing. The

DPPA was initially passed in 1994 as part of Title XXX of the Violent Crime Control and

Law Enforcement Act to govern the privacy and disclosure of personal information

gathered by State Departments of Motor Vehicles.  In recommending DPPA's passage,

Representative Edwards remarked:

> "Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold his names and address[es] from strangers, and his limit his access to personal identifiable information" in other records".

140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran),  (emphasis added).

b)   The Fifth Circuit has also uniformly recognized the Congressional intent of the DPPA:

"Congress originally passed it (as an amendment to the Crime Control and Law Enforcement Act of 1994) in response to the murder of actress Rebecca Schaeffer at the hands of a stalker. 140 CONG. REC. H2518-01, H2526 (1994) (Statement of Rep. Goss). His stalker used DMV records to find Schaeffer's unlisted home address. Id. The legislative history reflects the concern for victims of crimes committed using DMV records.", *Taylor v. Acxiom Corp.,* No. 2:07cv0001, 2008 U.S. Dist. LEXIS 115940 (E.D. Tex. Sept. 9, 2008), aff'd, 612 F.3d 325 (5th Cir. 2010).

c)   In enacting the DPPA Congress's unmistakable intent was to create an express legal

right prohibiting the "unauthorized access" to personal information contained within

motor vehicle records held by the State Motor Vehicle Departments.  That privacy

invasion is the precise concrete injury Plaintiff alleges here, acts sufficient to confer

Article III Standing.

**b. Injury-In-Fact- "Particularized" Requirement**

50. To establish the secondary standard of the first element –injury in fact- Plaintiff have

satisfied the "Particularized" requirement because it affected the Plaintiff in a

personal and *individual* manner, an injury suffered in particular, and not one suffered

by a third party or a "generalized grievance shared in substantially equal measure by

all or a large class of citizens," *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The

Defendants violated *his* statutory rights, not just the statutory rights of other people,

and *his* personal interests in the privacy of *his* motor vehicle records are individualized

rather than collective. The Plaintiff did not provide *his* express consent to permit

Defendants access to *his* motor vehicle records; furthermore, Defendants obtained,

re-disclosed, and/or resold *his individual* motor vehicle records, while the direct

marketing letters were sent to *his individual* residences.

**c.  Injury-In-Fact- "actual or imminent, not conjectural or hypothetical."**
**Requirement**

51. To establish the secondary standard of the first element –injury in fact- Plaintiff have

satisfied the injury was actual or imminent, not conjectural or hypothetical because

Defendant's actions had already occurred, IE, Defendants had already obtained

Plaintiff motor vehicle records, directly or indirectly, from State Motor Vehicle

Departments without a DPPA permissible use, had re-disclosed and/or re-sold Plaintiff

motor vehicle records to Defendant National Affiliates had actually sent direct

marketing letters to Plaintiff, and it had affected the Plaintiff. Such acts were actual,

while other acts noted below were imminent, and both were not "conjectural or

hypothetical."

**II. Injury-In-Fact- fairly traceable to the defendants' actions**

52. To establish the standard of the second element –injury in fact-fairly traceable to the

defendants' actions, - Plaintiff have satisfied his requirement because the

Defendant's actions made the basis of his action, revealed by investigation that

showed unequivocally that Defendants had violated the DPPA. Defendant Braverman

obtained the state motor vehicle records, directly or indirectly, to use for direct

marketing, without express consent.  The Plaintiff motor vehicle records possessed by

the Texas Department of Motor Vehicles records were identical to the motor vehicle

records incorporated into the datasets possessed by Defendant Herring, TaCito, and

BB Direct; furthermore, Defendants failed in their duty as re-sellers of the motor

vehicle records obtained from State Motor Vehicle Departments to confirm the DPPA

permissible uses of Defendant National Affiliates.

### III. Injury In Fact-that is likely to be redressed by a favorable decision

53. To establish the standard of the third element –injury in fact- that is likely to be

redressed by a favorable decision, Plaintiff have satisfied his requirement because a

favorable decision by his Court shall provide relief permitted by the DPPA, including an

order to cease Defendant's unauthorized obtainment, re-disclosure and/or re-sale of

Plaintiff and Class Members' motor vehicle records, a legal right provided to injured

parties within the DPPA which authorizes such redress. Plaintiff will further be

redressed when his Court orders permanent injunctive relief because Defendant's

violation of the DPPA is ongoing and, without the Court's intervention, will continue

even if the Court were to award only a money judgment for past instances of DPPA

violations to Plaintiff, but would do nothing to protect Plaintiff rights going forward.

# VI.
## STATEMENT OF FACTS

**A.** **Introduction**



54. For all consumers that have ever been harassed by direct marketing letters from auto

dealers wanting to "buy-back" your vehicle, or selling "extended vehicle service

contracts", falsely advertising that your vehicle warranty had expired, wondered how

these companies knew your personal information, IE., your name and address

associated with the make, model, and year of your vehicle, and had concerns that

your home address was publicly being sold and feared that your family's security was

at risk and privacy violated, this class action will identify sources used to obtain this

personal information and implement such unauthorized activities, and the elements of

a business enterprise implemented by the obtainment of  state motor vehicle records,

directly or indirectly, then re-disclosed and/or re-sold, in order to aid and abet the

direct marketing industry, acts done without the individuals' express consent, a

violation of the Driver's Privacy Protection Act ("DPPA").

55. The protections afforded consumers by the Driver's Privacy Protection Act is premised

upon a screening process qualifying access to state motor vehicle records. This

obligation is imposed on any and all individuals and entities that obtain, re-disclose,

and resell such data, imposing a duty on "Authorized Recipients", acting as re-sellers

to exercise reasonable care in responding to requests to purchase the motor vehicle

records. Individuals and entities that obtain, re-disclose, and/or re-sell the motor

vehicle records obtained from state motor vehicle departments, must follow screening

policies and reasonable verification measures. Defendants intentionally, or in the

alternative, negligently re-disclosed and/or re-sold motor vehicle records obtained

from the State Department of Motor Vehicles to Defendant National Affiliates,

without adequate screening precautions.

56. The unauthorized access to State Motor Vehicle Records exists at the "cost" of the

Plaintiff and Class Member's privacy and security, creating a reasonable fear of

present and future injury, compelling individuals to take costly and burdensome

measures to protect his privileged information from risk of access and probable harm.

Kristi Dyroff, an advocate with the National Organization for Victim Assistance,

discussed the consequences from the improper access to motor vehicle records:

Kristy Dyroff, National Organization for Victim Assistance, "DPPA fails to provide protection for crime victims", October 30, 2013, (last accessed June 3, 2016), online: http://www.trynova.org/category/nova-blog.

B. **Defendants' Business Practices**

57. On information and belief, the most prevalent unauthorized use of Motor Vehicles Records obtained from State Department of Motor Vehicles is by those persons and/or entities involved in the Motor Vehicle Industry, a billion-dollar enterprise. In order to outline the Defendant's business practices, and the incentive for Defendants to act as a "Supplier" or "Distributor", an understanding of the "Direct Marketing Vehicle Industry" is necessary, including knowing the participants, the participants' functions, and entities knowingly funding this enterprise.

58. There are at least six (6) principal participants in a Direct Marketing Vehicle Industry: (1) the consumer who purchases the vehicle or vehicle service contract, (the "Consumer"), (2) the dealer that markets to the consumer (the "Dealer"), (3) the administrator that develops and administers the agreement itself, and is the party obligated to reimburse costs, (the "Administrator"), (4) the risk retention group that guarantees to pay covered claims if the Administrator does not satisfy its obligation to the Consumer (the "Insurer"), (5) the financing organization that enables the Consumer to pay for the vehicle or vehicle service contract, (the "Financing Organization"), and (6) "the supplier," referencing individuals and entities that supply the leads originating from sources that include obtaining state motor vehicle records.

59. The Direct Marketing Vehicle Industry employs financial instruments to "vertically integrate" an association of entities requiring a "lead supply chain". A state's MVR database provides the most accurate and updated database of all licensed drivers and vehicles, providing a marketing database surpassing all other sources., albeit, the "Holy Grail" of all databases. As such, the Direct Marketing Vehicle Industry is involved with any and all means possible, at any costs, ignoring legal constraints, to procure this database. Once the database is obtained then the marketing and solicitation scheme can be implemented.

60. Defendant Braverman is an individual involved in the Direct Marketing Industry, acting as a Direct Market Provider assisting Direct Marketing entities. On information and belief, Defendant Monica Braverman obtains state motor vehicle records, directly or indirectly, from many state DMVs.

61. Defendant BB Direct is a corporation involved in the Direct Marketing Industry, acting as a Direct Market Provider assisting Direct Marketing persons and entities. Defendant BB Direct Inc.  obtains state motor vehicle records, directly or indirectly, from many state DMVs.

62. Defendant TaCito is a corporation involved in the Direct Marketing Industry, acting as a Direct Market Provider assisting Direct Marketing persons and entities. Defendant TaCito obtains state motor vehicle records, directly or indirectly, from many state DMVs.

63. Defendant Don Herring Ltd. is a corporation involved in the Motor Vehicle Industry, requiring Direct Market Providers to assist in Direct Marketing persons and entities. Defendant Don Herring Ltd. is in involved with the Defendants to directly market its

motor vehicles. Defendant Herring secures the services of Direct Marketing persons

and entities that obtains state motor vehicle records, directly or indirectly, from the

State DMV.

64. The VSC Industry is the poster child for marketing abuses, illegal telemarketing,

and deceptive mailers. It is a complex financial infrastructure, funded by a

multitude of financial institutions. The core of this industry is "fueled" by illegally

obtaining millions of motor vehicle records from State Motor Vehicle

Departments, the "grease" to create and send the Direct Marketing Vehicle

Industry marketing letters.

C.   **Defendants' Business Association & Practices-Admissions Against Interest**

65. In May 2016, Plaintiff Lopez received a direct marketing solicitation letter sent by

Defendant Don Herring, located at 3520 S. Marvin D. Love Freeway, Dallas, Texas

75224, The solicitation letter contained Plaintiff Lopez's Personal Identifying

Information, ("Pii"), including his full name, address, associated with the

make/model year of his vehicle, offering a "payment swap program". Plaintiff

Lopez's Personal Identifying Information contained within the Herring solicitation

letter gave the impression of a prior business association, a false advertisement and

deceptive practice, offering to 'buy-back" Plaintiff Lopez's vehicle for a sum certain,

based upon a "Black Book value", further evidencing that Black Book, a division of

Hearst Business Media Corporation, had been provided Plaintiff Lopez's MVR.

Discovery shall be required to determine Black Book's involvement in this matter.

**(See Exhibit 1)**.

66.  Defendant Don Herring Ltd., d/b/a Don Herring Mitsubishi, is an automobile

dealership located in the Dallas/Fort Worth Metroplex area, and describes its

business  as follows:

> "We have been in business since 1979, and we have never rested on our
> accomplishments. We have since expanded into three dealerships in Dallas,
> Irving, and Plano, Texas all serving fine Mitsubishi products"

> "Mitsubishi dealership in Texas", last Accessed September 3, 2016), online:
> http://www.donherring.com/about-don-herring-in-tx

67.  After receipt of the Don Herring solicitation letter, Plaintiff Lopez became

concerned about whether his Personal Identifying Information, ("Pii"), and motor

vehicle information, was being sold to marketing companies, jeopardizing his privacy

and security interests, and that of his family, due in part because Plaintiff Lopez did not

have a prior commercial relationship with Defendant Don Herring. Within a few days

after receipt of the letter Plaintiff Lopez contacted Defendant Don Herring's Dallas office

and spoke to Cary Wilson, a Senior Sales Associate at Don Herring's office located at

3520 S. Marvin D. Love Freeway, Dallas, Texas. **Mr. Wilson informed Plaintiff Lopez that

the source of his vehicle information originated from the Texas State Department of

Motor Vehicles., (See Exhibit 2,"Lopez Dec")**.

68. Plaintiff Lopez then sought to determine the validity of Mr. Wilson's statement, due

in part because he had not provided written express consent to Don Herring Mitsubishi,

Defendant Don Herring Ltd., or any direct marketing company, to obtain his motor

vehicle information from the Texas State Department of Motor Vehicles. An inquiry

related to this matter was sent to Mr. Wilson on May 10, 2016, **(See Exhibit 3).**

**69.** Mr. Reuben Mosely, General Sales Manager at Don Herring's office located at 3520 S. Marvin D. Love Freeway, Dallas, Texas responded to the inquiry on behalf of Mr. Wilson and noted, **"Yes that is correct. We use a third party company that supplies the information and it is gathered through vehicle registrations,** (See Exhibit 4).

70. In review of the Defendant Don Herring's solicitation letter a company was noted in fine print at the bottom of one (1) of the pages. It was TaCito & Associates Marketing, reportedly, "a direct marketing advertising agency that specializes in automotive marketing", TaCito & Associates Marketing is a subsidiary of Defendant TaCito & Associates, Inc., and owned by Anthony J. TaCito. Defendant Tacito's involvement was further noted in this letter by its offering of additional benefits if Plaintiff Lopez accessed the following website online: arthurlopez.KEYFORKEYEVENTS.COM, and entered the activation code: TDM 1456. This website is owned by TaCito & Associates Marketing. Reportedly TaCito & Associates Marketing has in excess of 167 similar domains used for direct marketing, including but not limited to, cdjrtestdrive.com, chevyupgradeevents.com, lhmprovoupgradeevents.com, dhmitsugc.com, bobboyteupgradeevents.com, ramgift.com, getsmorevalue.com, dhgiftcard.com, dealergc.com, vipappt.com, and vtgiftcard.com.

71. Defendant TaCito's website notes that it has provided services to "more than 15,000 dealers", and provides examples of its business practices which includes using databases of information to send mass mailings of direct marketing solicitation letter programs for auto dealerships, omitting the source of the Personal Identifying Information ("Pii") used to mail such letters. This business practice is detailed in key case histories:

**CLIENTS: Toyota Dealer Association**

CHALLENGE: Drive traffic and incremental sales into the showrooms of the seven Utah Toyota Dealers for a four-day sales event during the month of March.

STRATEGY: Invite previous Toyota owners to visit their selling dealer and also invite targeted customers in the market areas of the participating dealers to visit their local Toyota Dealer with a compelling direct mail offer.

TACTIC: Mail 100,000 prospects a High Impact "Savings Adventure" Direct Mail package. Free gift – Sleeping Bag or Coleman® Style Lantern Sweepstakes – Chance to win a camping stove, camping tent or a New Toyota Tacoma! Retail incentives – Reason to buy. Customers were invited to visit www.mysavingsadventure.com to see which prize they won.

**CLIENT:  Fuccillo Hyundai**

CHALLENGE: Create interest within the Syracuse, NY market area that generates retail showroom traffic and results in a record number of vehicles sold.

PROGRAM PERIOD: The Month of June (30 Days)

STRATEGY: Insure that all households that are in the defined market area are made aware of the sales promotion being held during the month of June at Fuccillo Hyundai known as HUGE-A-THON.

TACTIC: A variety of creative messages were produced as self mailers that reinforced the client's brand, HUGE, and the client's annual event, HUGE-A-THON.  These messages were sent to every deliverable household within a 50-60 mile radius of the client's Hyundai dealership. These direct mail impressions reinforced the overall advertising campaign.  More than 400,000 households received 2 or more direct mail messages within the 30 day sale period.

RESULT: In June 2007 Fuccillo Hyundai SOLD 2024 vehicles.

This is the most vehicle sales generated since the June HUGE-A-THON event began…

RESULT: 4,608 Customers registered on the website.  Sales leads were then e-mailed to the assigned dealer. Reported Sales: 293.

"Get Results", last Accessed September 3, 2016), online:
http://www.tacito.com/results.html

     

    

    

    

    

    

    

 

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







    

    

  

   

   

   

  

 

"Our Clients", last Accessed September 3, 2016), online:
http://www.tacito.com/clients.html,

72. On May 14, 2016 an inquiry was sent to Mr. Anthony J. TaCito, CEO of Defendant TaCito & Associates Inc., requesting information as to the source of the vehicle information displayed on Plaintiff Lopez's solicitation letter sent by Defendant Don Herring, sources identified by Mr. Wilson and Mr. Mosely as Defendant TaCito & Associates Inc.. **Mr. TaCito responded on May 16, 2016 stating the data was supplied by Defendant BB Direct Inc. for the past 13 years,** (**See Exhibit 5).**

73. The document attached to Mr. TaCito's May 16, 2016 response, referenced as "ArthurlopezRecord (1). Xlsx 9K", was noted as "a copy of the records provided from the BBDirect data file". (**See Exhibit 6).**

74. In review of this "ArthurlopezRecord" document, a column referenced as "Odometer", noted an odometer reading of **"15"**. The exact odometer reading is legally required to be provided to State Department of Motor Vehicles when motor vehicles are purchased. A document obtained from the Texas Department of Motor Vehicles when Plaintiff Lopez purchased his motor vehicle reveals the identical odometer reading of **"15"** as shown in the "ArthurlopezRecord" document possessed by Defendant TaCito & Associates Inc., and Defendant BB Direct Inc., (**See Exhibit 7).**

75. On information and belief, the business practices complained of herein, implemented by Mr. Anthony J. TaCito, CEO of Defendant TaCito & Associates Inc. and TaCito & Associates Marketing on behalf of Defendant Don Herring Ltd., appear to be similar in nature to the business practices implemented by Defendant TaCito & Associates Inc. on behalf of other clients. As such, discovery

shall be required of all Defendant TaCito & Associates Inc.'s business practices

with all clients, including but not limited to, the 15,000 dealers noted within its

website as clients, to determine whether any companies should be added to this

complaint as Doe Individuals and Corporations. (**See Exhibit 8).**

76. On May 17, 2016 an inquiry was sent to Mr. Brian Berg, CEO of Defendant BB

Direct Inc., requesting information as to the source of the information displayed

on Plaintiff Lopez's solicitation letter sent by Defendant Don Herring, a source

identified by Mr. A. J. TaCito of Defendant TaCito & Associates Inc., as originating

from Defendant BB Direct Inc. Mr. Berg confirmed that Defendant BB Direct Inc.

had been hired by Defendant TaCito & Associates Inc. to handle the account of

this dealership, Defendant Don Herring Ltd., and **Mr Berg stated the data had**

**been supplied by Defendant Braverman.** (See Exhibit 9).

77. Defendant BB Direct Inc. is reportedly a "provider of direct marketing data and

data related services", marketing automobile mailing lists:

"BB Direct Inc. 's Premium Automobile Mailing List is the most up-to-date and
robust auto database of its kind, outperforming other similar lists in terms of
accuracy and coverage. In addition to selecting by make, model, and year, BB
Direct Inc. 's automobile database also includes VIN (Vehicle Identification
Number) information. Unlike some automobile files, our database has coverage
in all 50 states, is Shelby compliant, and is updated every 2 weeks."

"Automobile Mailing List", last Accessed September 3, 2016), online:
http://www.bbdirect.com/auto- dealership-data/automobile-mailing-list

78. On May 17, 2016 Mr. Brian Berg responded on behalf of Defendant BB Direct Inc. and

stated that Defendant BB Direct Inc. had obtained databases from Defendant Monica

Braverman, operating companies under the name of Netunim, d/b/a Datashark. Fort

Worth, Texas civil court records reveal that Defendant Braverman had been married

to Charles Holley, an individual that had, and continues to in many states, directly

obtain State Motor Vehicle Records from Departments of Motor Vehicle in a multitude

of states, using numerous companies' names, including National Recall & Data

Services Inc.. Reportedly, Mr. Holley's has been associated with more than a thousand

companies. A covert investigation conducted by the Texas Department of Motor

Vehicle using "seeded" data found Mr. Holley violating the DPPA and access to Texas

MVR data terminated.  Mr. Holley is a Defendant in the following action:

> Laning et al v. National Recall & Data Services Inc. et. al., 3:16-cv-02358-B
> (N.D. Tex. 2016), a Federal Class Action involving similar underlying facts
> as the present action, violations of the Driver's Privacy Protection Act
> ("DPPA"), 18 U.S.C. § 2721, et seq.;

79. On May 17, 2016 an inquiry was sent to Monica Braverman, CEO of Defendant

Netunim, d/b/a/ DataShark regarding the statements made by Mr. Berg as to the

source of the motor vehicle record data that Defendant BB Direct Inc. obtained,

re-disclosed, and re-sold to BlackBook, Defendant TaCito & Associates, and

Defendant Don Herring Ltd. for uses that included, but not limited to, sending a

solicitation letter to Plaintiff Lopez. Mrs Braverman didn't respond.

80. Both Anthony J. TaCito, CEO of Defendant TaCito & Associates Inc., and Brian

Berg, CEO of Defendant BB Direct Inc.'s responses noted that the motor vehicle

record database was "Shelby Act Compliant", a reference to motor vehicle

records obtained from State Department of Motor Vehicles after 1999 requiring

the consumer to provide "**written express consent**" if their motor vehicle

records are used for direct marketing. As previously noted, the DPPA, was

initially enacted in 1994, then amended in 1999 to change the law to eliminate

the practice of selling personal information. Senator Shelby, the principal

sponsor, warned against "unrelated secondary uses" of motor vehicle

information without prior approval (i.e., for commercial sale in the open market),

when the records have been obtained only for the purpose of vehicle

registration. Senator Shelby underlined that the purpose of the DPPA was to

ensure that individuals must "grant his consent" before the state or a third party

can sell or release highly restricted personal information "when it is to be used

for the purpose of direct marketing, solicitations, or *individual look-up*." *4 Hrg.*

*Before the Subcomm. on Transp. of the S. Comm on Appropriations, 106th Cong.*

(2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

81. The statements by both Anthony J. TaCito, CEO of Defendant TaCito & Associates

Inc., and Brian Berg, CEO of Defendant BB Direct Inc. that the databases

obtained, re-disclosed, and re-sold which contained motor vehicle records, in

whole or part, including the motor vehicle records of Plaintiff Lopez, was "Shelby

Compliant",  was an admission as to their knowledge that the databases they

obtained and used for direct marketing was from State Motor Vehicle

Departments, and no other source, because being "Shelby Compliant" is a term

of art only used as it relates to motor vehicle records obtained from State

Department of Motor Vehicles. Anthony J. TaCito, CEO of Defendant TaCito &

Associates Inc., and Brian Berg, CEO of Defendant BB Direct Inc. had claimed the

Motor Vehicle Records obtained from State Motor Vehicle Departments, and

used by them for direct marketing was "Shelby Compliant" because such data

would not be subject to the same use restrictions that apply to DMV data. Brian

Berg, CEO of Defendant BB Direct Inc.'s response also claimed that the data was

"Shelby Compliant" since the data has been shown to have errors, thus it must

not be derived from State Department of Motor Vehicles; moreover, conflating

the reference to "Shelby Complaint" which only concerns motor vehicle records

obtained from state motor vehicle departments, Mr. Berg noted he was

informed the motor vehicle records originated from "oil lube stations, insurance

companies, and some auto groups".  Defendants will each receive a Request for

Production within discovery to produce documents showing the written express

consent of Plaintiff Lopez, and all Class Members, exist within its databases,

permitting obtainment of state motor vehicle records to use for direct

marketing. Since Plaintiff Lopez has not signed such a form, nor reportedly has

the State of Texas Motor Vehicle Department even created such a form

permitting written express consent for direct marketing use when accessing

MVRs, Defendants shall fail to provide such documents to prove this data is

"Shelby Complaint".

82. The Driver's Privacy Protection Act, 18 U.S.C. §2724(a) "sets forth the three

elements giving rise to liability, i.e., that a defendant (1) knowingly obtained,

disclosed, or used personal information, (2) from a motor vehicle record, (3) for a

purpose not permitted." Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone,

King and Stevens, P.A., 525 F.3d 1107, 1111 (11th Cir. 2008), Taylor v. Acxiom.

Corp. 612 F.3d. 325. 5th Cir. 7/14/10. 5th Cir.  Defendant's activity has satisfied

all three elements, giving rise to DPPA liability.

**D. Defendants had a duty to exercise reasonable care as "Resellers", prior to release of Motor Vehicles Records obtained from State DMVs.**

83. The legislative history of the DPPA makes it clear that it incorporated "the intentions of the 1972 Privacy Act…[And also] include[d] the recommendations of the 1977 Privacy Protection Study Commission [(PPSC")] report." The goal was to prohibit disclosure of "records" collected and maintained by a Government agency, expect under permissible circumstances. See 5 U.S.C. § 552a (b). The PPSC report recommended that third party record holders be held to the "same standard" as the Government in order to ensure compliance with the important statutory protections. Personal Privacy is an Information Society: The Report of the Privacy Protection Study Commission Ch. 13 (July 1977).

84. His literal reading of the DPPA was designed to promote public safety and to protect individual privacy, construed so as to maximize his deterrent effect – in particular, by shifting burdens to institutional actors who regularly engage in the targeted conduct or are otherwise in a position to minimize future violations.

85. Congress intended the states to be the "gatekeepers" of the motor vehicle records, limiting the number of people with access to the personal information because the greater the number of people with access, the greater the risk that personal information will be disseminated to those who do not have valid uses for the personal information.

86. Recognizing the threat caused by unfettered access to individuals' Personal Identifiable Information ("PII") obtained from motor vehicle records, and seeking to

balance that concern against the legitimate need of certain parties to have access to DMV records, Congress determined that those records should not be disclosed except to those with a legitimate need for them. It embodied that intent in a statutory scheme designed to carefully limit the uses for which such information may be disclosed. 18 U.S.C. § 2721(b). Congress made clear its intent that the burden of ensuring the permissibility of disclosures be borne by "Authorized Recipients" by imposing a record keeping obligation on them to maintain a list of not only the people to whom they disclosed the data, but also for what purpose the disclosure was made. 18 U.S.C. § 2721(c). The liability provisions of the DPPA are to be interpreted as imposing an affirmative obligation on resellers to determine the true purpose of the "Authorized Recipients."

87. In each sentence of section 2721(c) Congress linked the term "Authorized Recipient" to the specific section of 2721(b) that had authorized the release of the information to the recipient. Congress intended that the "Authorized Recipients" to be individuals, entities, or his agents, qualified to receive the information by the terms of section 2721(b). Resellers cannot obtain all of the personal information in the database simply by calling himself resellers. Entities requesting motor vehicle records have to justify his receipt of personal information under the 2721(b) exception is applicable. Defendants were not "Authorized Recipients."

88. The United States Supreme Court analyzed the DPPA's use of "Authorized Recipient" (albeit in dicta) in *Reno v. Condon*, noting a person must have initially obtained the data for a permissible purpose before resale or dissemination of the data:

After listing section 2721(b)'s fourteen permissible purposes, Chief Justice Rehnquist equated authorized recipients under section 2721(c) with "private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes." This is also the most logical conclusion based on the language of the DPPA, the purpose of the statute, the legislative history and common sense.(quoting *Reno v. Condon*, 528 U.S. at 146 (citing 18 U.S.C. §2721(c)).

89. To ensure that the privacy of driver records is adequately protected under the DPPA, it was necessary to impose a high standard of duty for resellers when the records they sell are subsequently used for impermissible purposes, due in part because an industry of "resellers" had arisen to facilitate acquisition by end-users of information collected by State Motor Vehicle Bureaus. As the reseller is in the best position to determine whether the subsequent use of the data would be permissible under the Act, it is the reseller that must bear the burden of ensuring that an impermissible use does not occur and must investigate to determine if entities requesting the motor vehicle records have a DPPA permissible purpose. The state agency ceases to be the custodian of the data once it is obtained by the reseller; the reseller must therefore assume the responsibility and the liability for the subsequent use of the data resulting from its intentional resale, especially as it relates to direct marketing. The civil remedies provision would be rendered "toothless" if resellers could insulate himself from liability based solely on conclusory representations of end users, without being required to exercise due care himself.

90. The DPPA regulates the activity of resellers when acting as a "middleman", and places civil damage liability on the person and/or company that knowingly obtains, re-discloses, resells, and purchases the motor vehicle records for improper purposes.

91. In light of the text, structure, and legislative history of the DPPA, resellers are subject to a duty of reasonable care before disclosing DPPA-protected personal information, 18 U.S.C. §2721(b)-(c). Resellers must exercise reasonable care in responding to requests for personal information drawn from motor vehicle records. Resellers are liable if they do not secure proof that representations made by the recipient of personal information was valid. Defendants failed to exercise such reasonable care when reselling the motor vehicle records.

92. The structure of the DPPA supports the conclusion that resellers owe a duty of reasonable care when reselling motor vehicle records to third parties. The DPPA statute uses the word "knowingly," revealing that a level of duty of care exists. The DPPA provides an award of "punitive damages upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2); In contrast, the court may award "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). The actual damages provision is silent as to the degree of fault necessary to trigger liability for actual damages. If, however, as the statute suggests, punitive damages are available only for willful and reckless violations of the DPPA, then actual damages must require something less—that is, conduct that is neither willful nor reckless.

93. The structure of the DPPA, clearly indicates that the liability of a reseller of motor vehicle records is not predicated on his knowledge of the end user's actual purpose. Rather, it is the same as the end user's. That is because section 2722(a) makes no distinction between the mental state required by the person who obtains motor vehicle records and one who discloses it. Indeed, the statue on its face applies equally

to those who "obtain" and those who "disclose" Personal Identifiable Information, 18 U.S.C. § 2722(a).

94. Section 2721(c) does not suggests that a reseller may re-disclose protected information so long as its customer claims to have a permissible use. Rather, the DPPA authorizes the resale of information only if there is an actual, not just a stated, permitted use. 18 U.S.C. § 2721(c); Thus, as a purely textual matter, the DPPA indicates that a reseller who sells protected information to a client without an actual permissible purpose is liable regardless what "certifications" that client has made.

95. Resellers owe the same or similar legal duty that obligates the State Motor Vehicle Department's when releasing motor vehicle records, that is to investigate fully whether individuals or companies obtaining the motor vehicle records have a DPPA permissible purpose. As the motor vehicle records are resold, in whole or part, the likelihood of misuse grows exponentially. The DPPA provides no distinction as to obligations of the end-user, resellers, nor the State Motor Vehicle Departments, as Custodian of the motor vehicle records, *Gordon v. Softech Int'l, Inc.,* U.S., No. 13-533, *cert. den.* 1/13/14; *Arcanum Investigations, Inc. v. Gordon,* U.S., No. 13-539, *cert. den.* 1/13/14).

96. All Defendants are involved, directly or indirectly, in the Direct Marketing industry. The DPPA restricts access to motor vehicle records for Direct Marketing unless express consent is obtained. Defendants failed to obtain express consent. Subsection (b) (12) implements an important objective of the DPPA—to restrict disclosure of personal information contained in motor vehicle records to businesses for the purpose of direct marketing and solicitation. Direct marketing and solicitation presented a particular

concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information. The DPPA was enacted in part to respond to the States' common practice of selling personal information to businesses that used it for marketing and solicitations. Congress chose to protect individual privacy by requiring a state DMV to obtain the license holder's express consent before permitting the disclosure, acquisition, and use of personal information for bulk solicitation.

97. To verify the eligibility to invoke the claimed DPPA permissible purpose, an entity must provide information, including but not limited to, proof relating to its business which must correspond to its claimed DPPA uses, current status, activity of the employing entity, and purported business affiliation. It is negligent if the reseller fails to make proper inquiries of the end-user, especially if "red flags" exist, and provide "red flags" requiring additional review prior to the purchase of the Plaintiff and Class Members' MVRs.

98. Defendants obtained the MVRs for a reason and with a purpose in mind. Federal Law required Defendants, acting as "re-sellers', to obligate National Affiliates to use the requested MVR information for purposes permitted by the DPPA. Hence, at a minimum, Defendants and National Affiliates disclosures were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

99. Defendants, acting as a reseller, had an actual legal duty to perform, other than the ministerial task of soliciting rote representations from prospective requestors.

Resellers must adhere to the same legal requirements as a State Department of Motor Vehicles representatives when re-releasing motor vehicle records, including but not limited to, confirming those obtaining motor vehicle records have a DPPA permissible use to obtain the motor vehicle records. This obligation is not met by a merely accepting verbatim the end user's "say-so" in the presence of "red flags" suggesting the requested information was being sought for an improper DPPA purpose. Defendants were well aware of each other Defendants business and objectives prior to the release to them of the Plaintiff and Class Members' MVRs.

100. Defendants acting individually and in concert with, acting as a prospective requestor of data which includes Personal Identifiable Information also has a duty, other than the ministerial task of soliciting rote representations from prospective resellers that the data was not derived, in whole or part, from motor vehicle records obtained from State Motor Vehicle Departments. The prospective requesters must confirm that the resellers had a DPPA permissible use to obtain the data and to re-disclose and the resell motor vehicle records. This obligation is not met merely by accepting the reseller's "say-so" in the presence of "red flags" suggesting the requested information was obtained for a proper purpose. Research would reveal that Defendants were involved in the direct marketing industry; moreover, a cursory review of Defendant's website would reveal its direct marketing business, and provide "red flags" requiring additional review prior to the purchase of the data.

101. Defendants had an ongoing business relationship with each other Defendant, individually and collectively, through which Defendants knew, or should have known, that the other Defendants were  Direct Marketer Providers. Defendants were required

to contractually agree with each Defendant that it would only use information for purposes permitted by the DPPA. Hence, at a minimum, Defendant's disclosures to each Defendants were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

102. Defendants were legally obligated to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

103. Defendants failed to verify the accuracy of underlying facts, purported business objectives and affiliations of each Defendant, declining to confirm inferences of risk that existed that each Defendant did not possess permissible DPPA purposes, actions best construed as deliberate ignorance, or in the alternative, negligent.

104. Defendants became the custodian of the motor vehicle records with a duty to exercise reasonable care when re-disclosing or reselling motor vehicle records. Third parties benefitted from Defendants as the custodian of the motor vehicle records.  On information and belief, Third Parties that did not obtain State Motor Vehicle Department records because they knew State Motor Vehicle Departments would not authorize them to obtain MVRs since they would use such for Direct Marketing Industry and knew it had no authority to obtain the state motor vehicle records directly. Defendants failed in this duty as gatekeeper, failing to exercise reasonable care by allowing third parties access to the motor vehicle records in such manner. Defendants failed intentionally, or in the alternative, negligently.

105. Defendants as custodian of the motor vehicle records, was obligated to investigate and determine whether each Defendant had a DPPA permissible use for the motor

vehicle records it sought from each Defendant; however, Defendants knowingly, with

willful and wanton disregard, or in the alternative, negligently, failed to provide a

reasonable investigation of each Defendant prior to reselling the motor vehicle

records. A minimal review by Defendants of the business practices would have

revealed "red flags", as to its claimed DPPA permissible uses since it was a direct

marketing entity.

106. This obligation exists to conduct investigative duties on resellers, using minimal

safeguards in a reseller's request process. Such additional burdens in doing so impose

the benefit of preventing stalking, harassment, identity theft, and other criminal acts

this would be well worth the time and expense of such a burden. Defendants

knowingly, or in the alternative carelessly, failed to take reasonable basic steps to

confirm the truthfulness of the stated purposes of the claimed DPPA uses by each

Defendant. This willful or negligent blindness is not a defense to liability.

**VI.**
**DEFENDANT'S HARMFUL BUSINESS PRACTICES**

107. Defendants' activities occurred throughout the United States, obtaining the motor

vehicle records of Plaintiff and the Class Members for purposes not permitted - a

course of action, and a body of information, that is protected from access and

disclosure by federal law.

108. Without remedy, Plaintiff and Class Members' privacy will continue to be violated by

Defendants and a multitude of companies affiliated with Defendants — companies

they've never heard of, companies they have no relationship with, and companies

they would never choose to trust with his motor vehicle records.

109. The collection, use, and disclosure of Plaintiff and Class Members' motor vehicle records by Defendants implicates Plaintiff and Class Members' privacy and physical safety. Such information is afforded special attention due to the consequences for both privacy and physical safety that may flow from its disclosure. The heightened privacy and physical safety concerns generated by obtaining, using, and disclosing such information, without authorization, is apparent in U.S. law, creating restrictive consent standards for its obtainment, use, and disclosure.

110. Defendants obtained Class Members' motor vehicle records for the purpose of committing a tortious and/or criminal act, and violated the rights of Plaintiff and Class Members.

111. Defendants have, either directly, or by aiding, abetting, and/or conspiring to do so, willfully, knowingly, negligently, or recklessly, disclosed, exploited, misappropriated and/or engaged in widespread commercial usage of Plaintiff and the Class Members' motor vehicle records, obtaining personal information for Defendants' own benefit, without legal authorization, and without Plaintiff and Class Members' knowledge, authorization, or consent. Such conduct constitutes a highly offensive and dangerous invasion of Plaintiff and the Class Members' privacy and safety.

112. Defendants knowingly obtained, disclosed, and/or re-sold Plaintiff and Class Members personal information, data derived from motor vehicle records in whole or part, for uses not permitted legally, a violation of a federal law which afforded statutory protections.

113. At all times material, Defendants, and agents of the Defendants, knew, or reasonably should have known, that his actions violated clearly established statutory rights of the

Plaintiff and the Class members.

114. The individual Defendants knowingly authorized, directed, ratified, approved, acquiesced in, committed or participated in disclosing Plaintiff and the Class members' highly restricted personal information.

115. The individual Defendants were aware, or should have been aware, that such a disclosure of Plaintiff and the Class members' highly restricted personal information, without the express consent of the person to whom the information pertained was an invasion of privacy in violation of the DPPA.

116. Plaintiff and Class Members were harmed when Defendants intentionally, or in the alternative, negligently, obtained, processed, disseminated, stored, and used motor vehicle records to market and solicit Plaintiff and Class Members', obtained without authorization, and invading his right of privacy.

117. Defendants' conduct caused harm to Plaintiff and Class Members' privacy and safety expectations.

118. Defendants were not authorized to have free access to Plaintiff and Class Members' motor vehicle records for purposes unrelated to Defendants' claimed DPPA purpose when initially obtaining the motor vehicle records from the state.

119. Defendants failed to acquire, independently, and in concert, the express consent, of Plaintiff and Class Members before obtaining, collecting, generating, deriving, disseminating, storing, or causing to be stored, re-disclosing or purchasing the MVR data of Plaintiff and Class Members.

120. The Defendant provided the Plaintiff and Class Members' MVR data to third parties in the form in which it is acquired or Defendants changed the form or content of the

MVR data in order to avoid detection.

121. Third parties associated with Defendants that accessed Plaintiff and Class Members' motor vehicle records failed to provide notice of any and all of its activities, any and all uses of the motor vehicle records, present location of all motor vehicle records, and the identity of parties that accessed such motor vehicle records.

122. The Defendants accessed MVR data which included information about children that qualify to obtain a driver's license and/or register a motor vehicle, failing to distinguish personal data about children ages 18 and under from personal data about adults.

123. The Defendants failed to provide adequate policies, practices, and procedures relating to the re-disclosure and resale to third parties obtaining the Plaintiff and Class Members' motor vehicle records.

124. The Defendants failed to monitor compliance regarding the conditions of use between third parties involved in the re-disclosure, resale of Plaintiff and Class Members' motor vehicle records, failing to enumerate prohibitions and restrictions on access to the motor vehicle records.

125. Defendants used, or permitted to be used, false and misleading advertisements, derived from the data within Plaintiff and Class Members' motor vehicle records, in a marketing and solicitation exploit, sending a deceptive mailer which included false statements advising Plaintiff and Class Members that his auto warranties had expired, or were about to expire, creating a sense of urgency by claiming the offering period was limited, mailing such in an envelope which appeared to be state official business.

126. Defendants' activities alleged herein in parts constituted a knowing and intentional scheme to defraud Plaintiff and the Class Members, and to wrongfully access and

retain Plaintiff and Class Members' motor vehicle records.

127. In the course of committing the acts described above, Defendants intentionally accessed, on a repetitive basis, and without authorization, documents, derived in whole or part, from government facilities, in order to obtain Plaintiff and Class Members' motor vehicle records, intentionally exceeding access authorization, obtaining, and using Plaintiff and Class Members' motor vehicle records for impermissible purposes.

128. Harms and damages to Plaintiff and the Class Members occurred during the class period set forth in the factual allegations herein and continue to the present, as a consequence of Defendants' conduct in harvesting Plaintiff and Class Members' motor vehicle records.

129. Further, through its practices, Defendants have been able to raise its profile as possessing motor vehicle records with many companies, enabling Defendants to attract business, increase its prospective revenue, secure investment funding, and thereby profit from its conduct described herein.

130.  As with any form of property, Plaintiff, as the owners, should be compensated for the use and exploitation thereof, and if they are not, they suffer concrete, measurable damage and injury, the exact amount of which shall be provided by Plaintiff through expert opinion.

131. The Defendants acquired Plaintiff and Class Members' motor vehicle records that were unnecessary to motor vehicle records stated functions, but were useful to the Defendants in his commercial compilation, and use of the data derived from the motor vehicle records. With the motor vehicle records acquired, the Defendants used

the information to compile—in addition to the types of information—personal and

private information that included consumers' personal characteristics.

132. During the Class Period, each Plaintiff named herein had personal motor vehicle

records obtained, used, re-disclosed, stored, resold, and purchased for purposes that

included marketing and solicitation, without his express consent. Such data was

identifiable as to each of the Plaintiff and Class Members and were transmitted to

third parties for purposes wholly unrelated to its use and functionality when Plaintiff

and Class Members produced such to the state. Based upon information and belief,

the motor vehicle records continue to be sold to a multitude of entities.

## VII.
## CLASS ALLEGATIONS

133. Plaintiff bring his action on behalf of himself and as a class action pursuant to Rule 23

of the Federal Rules of Civil Procedure. Plaintiff seek certification of the following

classes (collectively, the "Classes"):

  1. **NATIONWIDE CLASS**: All persons in the United States who, on or after, four (4)
  years prior to the date of his filed complaint, through the final disposition of this or
  any related actions (the "Class Period"), had Defendants Monica Braverman, BB Direct
  Inc., and TaCito & Associates Inc., obtain their motor vehicle records, obtained directly
  or indirectly, from their State Department of Motor Vehicles, to re-disclose, and/or
  resell, for direct marketing purposes, without written express consent, in violation of
  the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. (Some persons within the
  **NATIONWIDE CLASS** are also within the **TEXAS SUBCLASS**);

  2. **TEXAS SUBCLASS:** All persons in the United States who, on or after, four (4) years
  prior to the date of his filed complaint, through the final disposition of this or any
  related actions (the "Class Period"), had Defendants Monica Braverman, BB Direct Inc.,
  TaCito & Associates Inc., and Don Herring Ltd., obtain their motor vehicle records,
  obtained directly or indirectly, from their State Department of Motor Vehicles, to re-
  disclose, and/or resell, for direct marketing purposes, without written express
  consent, in violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. (All

persons within the **TEXAS SUBCLASS** are also within the **NATIONWIDE CLASS**).

134. Excluded from the class are the Defendants, its employees, officers, directors, agent, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which Defendants' exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, in addition to Plaintiff legal counsel, employees, and his immediate family, the judicial officers and his immediate family, and associated court staff assigned to his case, and all persons within the third degree of consanguinity, to any such persons.

135. Plaintiff reserve the right to revise these definitions of the classes based on facts they learn as litigation progresses.

136. The Class consists of millions, if not tens of millions, of individuals and other entities, making joinder impractical.

137. The members of the Class are identifiable from the information and records in the custody of the Defendants identified in the Class definition.

138. Defendants' conduct, as complained of herein, is generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

139. The claims of Plaintiff are typical of the claims of all other Class Members.

140. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff have suffered damages in his own capacity from the practices complained of,

in that his personal information or highly restricted personal information has been

unlawfully obtained, disclosed, and sold for a profit, and is ready, willing, and able, to

serve as Class representatives.

141. Plaintiff and his counsel are committed to vigorously prosecuting his action on behalf

of the Class Members, and have the financial resources to do so. Neither Plaintiff nor

his counsel have any interest that might cause them not to vigorously pursue his

action. Plaintiff have retained counsel with substantial experience in prosecuting

complex litigation and class actions involving unlawful commercial practices related to

Federal Privacy Class Actions, including, but not limited to, the following Driver's

Privacy Protection Act ("DPPA"),18 U.S.C. § 2721, et seq. Federal Class Actions:

1. Lane v. Facebook, Inc., 696 F.3d 811, 821 (9thCir. 2012) cert. denied,13-136, 2013 WL 5878083(U.S. Nov. 4, 2013), a Federal Class Action, decided by the United States Supreme Court, involving similar underlying facts as the present action, about 30 companies, violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, et seq.;

2. Cross v. Blank, Adv. No.: 9:15ap00926FMD, (M.D. Fla. 2015), a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"),18 U.S.C. § 2721, et seq.;

3. Cook v. ACS State & Local Solutions, Inc. 663 F.3d 989 (10th Cir. 2011), a Federal Class Action involving similar underlying facts as the present actions violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

4. Doe et. al. v. Compact Information Systems Inc. et al., 3:13cv05013MBH, (N.D. Tex. 2013), a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

5. Haney v. Recall Center, No. 10-cv-04003 (W.D. Ark. May 9, 2012) a Federal Class Action, (certified class action), involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

6. Richard Fresco v. R.L. Polk., No. 09-13344 (11th Cir. 2010), (Fresco II"- Intervention), a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

7. Sharon Taylor et al. v. Acxiom Corporation et al., 2:07-cv-0001, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

8. Sharon Taylor et. al. v. ACS State & Local Solutions, Inc. et. al., 2:07-cv-0013, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

9. Sharon Taylor et. al. v. Texas Farm Bureau Mutual Insurance Company et.al., 2:07-cv-0014, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

10. Sharon Taylor et. al. v. Safeway Inc. et. al., 2:07-cv-0017, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

11. Sharon Taylor et. al. v. Biometric Access Company et. al., 2:07-cv-0018, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

12. Sharon Taylor et. al. v. Freeman Publishers Inc., 2:07-cv-0410, et. al., (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

13. Arthur Lopez v. Cross-Sell et. al., 3:16-cv-02009-K, (N.D. Tex. 2016), a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

14. Laning et al v. National Recall & Data Services Inc. et. al., 3:16-cv-02358-B (N.D. Tex. 2016), a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, et seq.;

142. A class action will cause an orderly and expeditious administration of Class Members' claims and economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured. Individual Class Members are unlikely to be aware of his rights and are not likely to be in a position (either through experience or financially) to commence individual litigation against Defendants.

143. Absent a class action, most Class Members would find the cost of litigating his claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

144. The Defendants have acted and failed to act on grounds generally applicable to Plaintiff and all of the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

145. The factual and legal basis of Defendants' liability to Plaintiff, and to the other Class Members are the same, resulted in injury to Plaintiff and all of the other Class Members. Plaintiff and the other Class Members have all suffered harm and damages as a result of Defendants' wrongful conduct.

146. Certification of a class under Fed. R. Civ. P. 23 is appropriate because Plaintiff and the putative Class Members have questions of law and fact that are common to the Class

that predominate over any questions affecting only individual members of the Class, and a class action is superior to all other available methods for fair and efficient adjudication of his controversy in fact, the wrongs suffered and remedies sought by Plaintiff and the other members of the Class are premised upon an unlawful scheme participated in by Defendants.

147. There are many questions of law and fact common to Plaintiff and the Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to the following:

1. whether Defendant Monica Braverman obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

2. whether Defendant BB Direct Inc.  obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

3. whether Defendant TaCito & Associates Inc. obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

4. whether Defendant Don Herring Ltd. obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

5. whether Defendant Monica Braverman had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

6. whether Defendant BB Direct Inc.  had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

7. whether Defendant TaCito & Associates had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

8. whether Defendant Don Herring Ltd. had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

9. whether Defendants Monica Braverman obtained the written express consent of Plaintiff and Class Members to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

10. whether Defendant BB Direct Inc. obtained the written express consent of Plaintiff and Class Members to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

11. whether Defendant TaCito & Associates obtained the written express consent of Plaintiff and Class Members to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

12. whether Defendant Don Herring Ltd. obtained the written express consent of Plaintiff and Class Members to obtain, re-disclose, and/or resell Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

13. whether Defendant Monica Braverman acted knowingly when it obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

14. whether Defendant BB Direct Inc. acted knowingly when it obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

15. whether Defendant TaCito & Associates acted knowingly when it obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

16. whether Defendant Don Herring Ltd. acted knowingly when it obtained, re-disclosed, and/or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

17. whether Defendant Monica Braverman's conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

18. whether Defendant BB Direct Inc. 's conduct described herein violates the

Driver's Privacy Protection Act, 18 U.S.C. §2721;

19. whether Defendant TaCito & Associates Inc.'s conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

20. whether Defendant Don Herring Ltd.'s  conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

21. whether Defendant Monica Braverman, as custodian of the Plaintiff and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendants BB Direct Inc., TaCito & Associates Inc., and Don Herring Ltd., prior to, during, and after, re-disclosing, and/or re-selling Plaintiff and Class Members' motor vehicle records to such entities by permitting procurement, re-disclosure, and re-sale of the Plaintiff and Class Members' motor vehicle records by such entities, and if so, whether Defendants Monica Braverman intentionally, or in the alternative, negligently failed in his obligation;

22. whether Defendant BB Direct Inc., as recipient of the Plaintiff and Class Members' motor vehicle records from Defendants Monica Braverman had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendant Monica Braverman used to obtain, directly or indirectly, the motor vehicle records from the State Department of Motor Vehicles, prior to, during, and after, obtaining Plaintiff and Class Members' motor vehicle records; moreover, whether Defendant BB Direct Inc. , by re-disclosing and re-selling the Plaintiff and Class Members' motor vehicle records to Defendants had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendants, and if so, whether Defendant BB Direct Inc. intentionally, or in the alternative, negligently failed in his obligation;

23. whether Defendant Tacito & Associates Inc., as recipient of the Plaintiff and Class Members' motor vehicle records from Defendant BB Direct Inc., had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendant BB Direct Inc., used to obtain, directly or indirectly, the motor vehicle records from the State Department of Motor Vehicles, prior to, during, and after, obtaining Plaintiff and Class Members' motor vehicle records; moreover, whether Defendant Tacito & Associates Inc., by re-disclosing and re-selling the Plaintiff and Class Members' motor vehicle records to Defendants had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendants, and if so, whether Defendant Tacito & Associates Inc., intentionally, or in the alternative, negligently failed in his obligation;

24. whether Defendant Don Herring Ltd., as recipient of the Plaintiff and Class Members' motor vehicle records from Defendant Tacito & Associates Inc., had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA

permissible uses by Defendant Tacito & Associates Inc., used to obtain the motor vehicle records from the State Department of Motor Vehicles, prior to, during, and after, obtaining Plaintiff and Class Members' motor vehicle records; moreover, whether Defendant Don Herring Ltd., by re-disclosing and re-selling the Plaintiff and Class Members' motor vehicle records to Defendants had a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by Defendants, and if so, whether Defendant Don Herring Ltd., intentionally, or in the alternative, negligently failed in his obligation;

25. whether Defendant Monica Braverman complied with 18 U.S.C. §2721 (c), the obligation to maintain a record of any person and/or company that Defendant Monica Braverman re-disclosed, and /or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant Monica Braverman intentionally, or in the alternative, negligently failed in his obligation;

26. whether Defendant BB Direct Inc.  complied with 18 U.S.C.  §2721 (c), the obligation to maintain a record of any person and/or company that Defendant BB Direct Inc.  re-disclosed, and /or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant BB Direct Inc., intentionally, or in the alternative, negligently failed in his obligation;

27. whether Defendant TaCito & Associates Inc., complied with 18 U.S.C.  §2721 (c), the obligation to maintain a record of any person and/or company that Defendant BB Direct Inc.  re-disclosed, and /or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant TaCito & Associates Inc., intentionally, or in the alternative, negligently failed in his obligation;

28. whether Defendant Don Herring Ltd. complied with 18 U.S.C.  §2721 (c), the obligation to maintain a record of any person and/or company that Defendant BB Direct Inc.  re-disclosed, and /or resold Plaintiff and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant Don Herring Inc., intentionally, or in the alternative, negligently failed in his obligation; the nature, and extent of Plaintiff and Class Members' damages;

29. the nature, and extent of all statutory penalties, including liquidated damages of $2500.00, and/ or damages for which Defendant Monica Braverman are liable for, and legally obligated to, Plaintiff and Class Members;

30. the nature, and extent of all statutory penalties, including liquidated damages of

$2500.00, and/ or damages for which Defendant BB Direct Inc. is liable for, and legally obligated to, Plaintiff and Class Members;

31. the nature, and extent of all statutory penalties, including liquidated damages of $2500.00, and/ or damages for which Defendant TaCito & Associates Inc. is liable for, and legally obligated to, Plaintiff and Class Members;

32. the nature, and extent of all statutory penalties, including liquidated damages of $2500.00, and/ or damages for which Defendant Don Herring Ltd. is liable for, and legally obligated to, Plaintiff and Class Members;

33. whether Plaintiff and Class Members are entitled to appropriate injunctive relief against Defendant Monica Braverman;

31. whether Plaintiff and Class Members are entitled to appropriate injunctive relief against Defendant BB Direct Inc.;

32. whether Plaintiff and Class Members are entitled to appropriate injunctive relief against Defendant TaCito & Associates Inc.;

33. whether Plaintiff and Class Members are entitled to appropriate injunctive relief against Defendant Don Herring Ltd.; and

34. whether punitive damages are appropriate.

148. The questions of law and fact common to Class Members predominate over any

questions affecting only individual members; and a class action is superior to all other

available methods for the fair and efficient adjudication of his controversy.

**COUNT I**
**Violations of the Driver's Privacy Protection Act, § 18 U.S.C. § 2721 et seq.:**
**On Behalf of All Classes, and against All Defendants**

149. Plaintiff incorporate by reference and re-allege all paragraphs previously alleged

herein.

150. As set forth herein, Defendants violated the Driver's Privacy Protection Act, 18 U.S.C.

§ 2721, by engaging in the acts alleged in his complaint.

151. The Driver's Privacy Protection Act, 18 U.S.C. §2721 (a) et seq., regulates obtaining and disclosing personal information gathered by State Departments of Motor Vehicles, making it unlawful for a person or organization from knowingly obtaining or disclosing personal information, or highly restricted personal information contained in motor vehicle records for any purpose not specifically enumerated under §2721(b).

152. Accordingly, Defendants violated 18 U.S.C. §2721 et seq. by intentionally obtaining, re-disclosing, and/or re-selling Plaintiff and Class Members' motor vehicle records without knowledge, consent, or authorization, for purposes not specifically enumerated with the act.

153. Plaintiff and Class Members are "person[s] referencing" "an individual, organization, or entity, but does not include a State or agency thereof", within the meaning of 18 U.S.C. §2725(2).

154. 18 U.S.C. § 2724(a) prohibits the release and disclosure of personal information, as defined in 18 U.S.C. § 2725(3) about an individual obtained by the State Motor Vehicle Department except as provided in subsection (b), permissible uses, regulates the prohibition on release and use of certain personal information from State motor vehicle records.

155. 18 U.S.C. §2725(3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the five (5) digit zip code), telephone number, and medical or disability information; but does not include information on vehicular accidents, driving violations, and driver's status.

156. The contents of the records obtained by Defendants pertaining to the Plaintiff and

Class Members constitute a "motor vehicle record", referencing "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles", within the meaning of 18 U.S.C. §2725(1).

157. 18 U.S.C. § 2722(b), prohibits any organization or entity from making any false representation to obtain any personal information or highly restricted personal information from an individual's motor vehicle record.

158. Defendants violated 18 U.S.C. §2721 (b), individually, and in concert, by making false representations to knowingly obtain the Plaintiff and Class Members' motor vehicle records, directly or indirectly, for Direct Marketing purposes, knowingly, or in the alternative, providing for use in marketing and solicitation Plaintiff and Class Members, without his express consent.

159. 18 U.S.C. §2725(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public Law 106-229.

160. 18 U.S.C. § 2721(c), permits an "Authorized Recipient" of personal information (except for some exceptions) to re-disclose and/or re-sell the information, but only for a claimed use permitted under 18 U.S.C. § 2721(b). Defendants were not Authorized Recipients, thereby violating 18 U.S.C. § 2721(c).

161. Defendants violated 18 U.S.C. § 2721(c) by re-disclosing and/or re-selling Plaintiff and Class Members' information to non-Authorized Recipients.

162. Defendants are liable directly and/or vicariously for re-disclosure and resale, failing to use reasonable care to investigate the claimed DPPA permissible uses when re-

disclosing and/or re-selling Plaintiff and Class Members' motor vehicle records to such entities.

163.  18 U.S.C. § 2722(b)(12), prohibits the use of motor vehicle records for bulk distribution for surveys, marketing or solicitations unless the State has obtained the express consent of the person to whom such personal information pertains. Defendant NAVISS violated 18 U.S.C. § 2722(b)(12) by obtaining, re-disclosing, and/or re-selling the motor vehicle records for purposes that include direct marketing, without the express consent of Plaintiff and Class Members.

164. Defendants, violated 18 U.S.C. § 2721(c) as recipients of the Plaintiff and Class Members' motor vehicle records, failing to use reasonable care to investigate and determine the validity of claimed DPPA permissible uses which were used to obtain the motor vehicle records from the State Department of Motor Vehicles, prior to, during, and after, obtaining Plaintiff and Class Members' motor vehicle records.

165. Plaintiff and the Class have suffered damages, as alleged herein, and pursuant to 18 U.S.C. § 2724(b)(1), are entitled to actual damages, but not less than liquidated damages in the amount of $2,500 each.

166. Plaintiff and the Class, pursuant to 18 U.S.C. § 2724(b)(1), are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of money, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiff remedy at law is not adequate to compensate him for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief as provided by 18 U.S.C. § 2724(b)(1).

167. As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiff, and each of them, have been caused to sustain harm.

168. All of the acts and activities of Defendants, as heretofore set out, were performed intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion, negligently.  Plaintiff and Class Members were damaged thereby, and seek redress thereof.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, individually, and on behalf of all others similarly situated, respectfully prays for judgment against Defendants as follows:

a)  For an order certifying that his action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(1)(a), (b)(2), and (b)(3);

b)  For an order designating Plaintiff and his counsel as representatives of the Class;

c)  For a declaration that Defendants' actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class;

d)  As applicable to the Class mutatis mutandis, awarding injunctive and equitable relief including, inter alia: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiff and the other Class Members motor vehicle records, or to whomever the Court deems appropriate; (iii) requiring Defendants to delete all motor vehicle records collected through the acts alleged above; (iv) awarding Plaintiff and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and (v) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

e)  For a preliminary and permanent injunction restraining Defendants, its officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

1.  Obtaining, directly or indirectly, Plaintiff and Class Members' Motor Vehicle

Records, without express consent, from the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

2. Re-disclosing Plaintiff and Class Members' motor vehicle records for purposes that violate the DPPA;

3. Reselling Plaintiff and Class Members' motor vehicle records for purposes that violate DPPA;

1. A permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with them during the pendency of his action and thereafter perpetually, from:

   1. Obtaining, directly or indirectly, Plaintiff and Class Members' Motor Vehicle Records, derived in whole or part, from data maintained by his State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

   2. Using, processing, and disseminating, Plaintiff and Class Members' motor vehicle records for purposes that violate the DPPA;

   3. Re-disclosing by reselling Plaintiff and Class Members' motor vehicle records for purposes that violate DPPA;

   4. Using, directly or indirectly, Plaintiff and Class Members' motor vehicle records to conduct direct marketing on Plaintiff and Class Members, without his express consent, for purposes that violate the DPPA.

f) For an award to Plaintiff and the Class of his costs and expenses of his litigation;

g) For an award to Plaintiff and the Class for his reasonable attorneys' fees

h) An award to Class Members of damages, including but not limited to: compensatory, statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

i) For pre-and post-judgment interest as allowed by law; and

j) For such other relief as the Court may deem just and proper.

Dated: September 17, 2016

Respectfully submitted,
LAW OFFICES OF JOSEPH H. MALLEY P.C.


By: /s/ Joseph H. Malley
JOSEPH H. MALLEY
1045 North Zang Blvd
Dallas, TX 75208
Telephone: 214.943.6100
Facsimile: 214. 943.6170
malleylaw@gmail.com


Attorney for Plaintiff Arthur Lopez,
individually, and on behalf of a class of
similarly situated individuals